**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE, | ) CASE NO.: |
| | ) |
| Plaintiff, | ) JUDGE: |
| | ) |
| -vs- | ) |
| | ) |
| THE COLLEGE OF WOOSTER | ) **VERIFIED COMPLAINT** |
| c/o CC&J Agents, Inc. | ) |
| 225 North Market Street | ) **(Jury Trial Demanded)** |
| Wooster, Ohio 44691, | ) |
| | ) |
| Defendant. | ) |

**CIVIL ACTION COMPLAINT**

Plaintiff John Doe,[1] by and through undersigned counsel, files this Complaint against The

College of Wooster ("Wooster") and, in support thereof, alleges as follows:

**I.      INTRODUCTION**

1.      This case arises out of biased, improper, unfair, and negligent actions taken by

Wooster after Jane Doe 1[2] made false allegations against Plaintiff John Doe ("John"), a male

student at Wooster.

---

[1]      Contemporaneously with this Complaint, Plaintiff has filed a Motion for Permission to Proceed
Under Pseudonym.  In accordance with that motion, all student names have been redacted from exhibits
and the verification form attached to this Complaint.

[2]      Pseudonyms are also used to protect other students' identities.

2.      The actions taken by Wooster resulted in a flawed investigatory and disciplinary process during which time Wooster denied John the fairness owed to him through Wooster's student handbook The Scot's Key ("Scot's Key") and in violation of Title IX.

3.      Instead of addressing Jane Doe 1's allegations in a neutral manner, Wooster capitulated to the capricious demands of Jane Doe 1.

4.      Jane Doe 1, a female student at Wooster, is the co-president of K(no)w, a student advocacy organization that fights against rape culture at Wooster. K(no)w publicizes its contact with high level administrators at Wooster regarding the school practices and support of survivors of sexual assault. K(no)w has become an influential and persistent voice at Wooster.

5.      In November 2015, K(no)w members distributed throughout campus posters criticizing Wooster's handling of reports of sexual assault, as well as Wooster's policies and practices for reporting and investigating claims of sexual misconduct. Some of the circulated posters published personally identifiable details about students, presumably males, accused of sexual misconduct. Other posters contained inaccurate information regarding Wooster's policies and procedures relating to sexual misconduct cases in an effort to force Wooster to respond more aggressively against accused students. Despite this conduct, Wooster permitted K(no)w to remain an active student organization on campus.

6.      In September 2016, K(no)w members installed art work at the Lowry Center depicting female genitalia. Students complained to Wooster administration that the art work violated Wooster's sexual harassment policy. Jane Doe 1 met with Carolyn Buxton ("Dean Buxton"), Senior Associate Dean of Students, to refute the complaints related to the art installation. After the meeting with Jane Doe 1, Dean Buxton determined that the art work did

2

not violate the Wooster's policies and, therefore, the art work remained on display in the Lowry Center.

7.    K(no)w publicized the fact that it influenced Wooster administrators.  Indeed, Jane Doe 1 bragged to The Wooster Voice about K(no)w's victory and made specific mention that it was in the process of setting up meetings with Dean Scott Brown and President Sarah Bolton ("President Bolton") to discuss K(no)w's agenda.

8.    K(no)w officers also serve in other pivotal roles on campus.  These positions enable K(no)w officers to further their agenda.

9.    Jane Doe 2, co-president of K(no)w, serves on Wooster's Judicial Board ("Judicial Board").  She described the Judicial Board as a group of students and administrators who decide sanctions after severe inappropriate action is taken by suspect students.  The logical conclusion that flows from this description is that Jane Doe 2 presumes the guilt of an accused student even before she evaluates evidence to decide if a charge should issue.

10.    On December 2, 2016, Jane Doe 2 signed the charge letter to John for alleged violations of Wooster's Code of Social Responsibility as outlined in The Scot's Key, when she should have recused herself given her relationship with Jane Doe 1.  As will be shown below, Wooster's College Judicial System was applied to John in an unfair and discriminatory manner to appease Jane Doe 1 and her cohort at K(no)w.

## II.    PARTIES

11.    John resides in Michigan.  At all times herein, John was a student at Wooster.

12.    Defendant Wooster is a private liberal arts college and premier college for mentored undergraduate research.  Wooster has approximately 2,000 students.  Only Wooster

and Princeton University have made the *U.S. News and World Report* list of outstanding undergraduate research opportunities and senior capstone projects.

13.     Dean Buxton, at all times material to this complaint, was Senior Associate Dean of Students at Wooster and acted within the course and scope of her authority as Senior Associate Dean of Students.

14.     President Bolton, at all times material to this complaint, was the President of Wooster and acted both within the course and scope of her authority as President.

15.     At all times material hereto, Wooster acted by and through its agents, servants, employees and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion to Wooster's business, mission and/or affairs.

### III.     JURISDICTION AND VENUE

16.     Plaintiff invokes this Court's original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, et seq., and 28 U.S.C. § 1331 (hereinafter referred to as "Title IX").

17.     This case is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332.

18.     The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

19.     Venue in this action is proper under 28 U.S.C. § 1391.  The Defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

20.     Plaintiff also invokes this Court's jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

## IV.     FACTUAL BACKGROUND

### A. John's Decision to Attend Wooster

21.     Prior to attending Wooster, John was an accomplished high school student who succeeded academically and excelled in extra-curricular activities such as lacrosse and football.

22.     John was accepted to a number of reputable universities, including Fordham University, Hiram College, Michigan State University and Wittenberg University.

23.     John chose Wooster because he believed that a small liberal arts college would allow him to make a difference on campus rather than simply being a number at a larger institution.  He was also drawn to the individualized attention afforded to students at Wooster.

24.     Wooster extended an offer of admission to John for the academic year starting in September 2012.  To induce his acceptance, Wooster awarded John the Clarence Beecher Allen Scholarship, named in honor of Wooster's first African-American graduate.  The scholarship was awarded to John, an African-American student, to promote diversity within the student body.

25.     John accepted Wooster's offer of admission, but deferred his admission to spend a gap year in Utah and Colorado.

26.     Each year that John has attended Wooster, he has paid tuition.  Wooster accepted John's tuition and enrolled him in classes.

27.     John is majoring in Political Science, with a minor in Philosophy and is scheduled to graduate this May 2017.

**B. Wooster's Policies and Procedures Governing Student Misconduct Matters**

28.    On April 11, 2011, the United States Department of Education's Office for Civil Rights issued a "Dear Colleague Letter" on the topic of sexual misconduct proceedings. The Dear Colleague Letter sought to provide guidance to schools regarding the unique issues that arise in sexual misconduct cases. In reality, the 2011 Dear Colleague Letter encourages schools to operate sexual misconduct proceedings in a more victim-centered manner by, for example, affording both parties the right to appeal decisions, encouraging schools to utilize a lower standard of proof for the complainant, and rushing timelines for investigation and adjudication.

29.    In response to the 2011 Dear Colleague Letter, most colleges and universities have developed more stringent procedures for sexual misconduct proceedings. Once an accusation is lodged against a student, often hasty and draconian procedures called "interim measures" are employed.

30.    Interim measures often limit where accused students have access on campus. By way of example, sometimes accused students are forced to move dorms or even move off campus. Accused students also can be required to change their class schedules prior to any real investigation into the allegations lodged, in an effort to accommodate the demands of accusers.

31.    To encourage compliance with the directives of the 2011 Dear Colleague Letter, the Department of Education can withhold federal funding from institutions that do not implement the guidance.

32.    In October 2014, Wooster revised its sexual misconduct policy to conform to the Dear Colleague Letter. The Secretary of the College and Title IX Coordinator Angela Johnston stated that the new policy was implemented following the Department of Education's changes to the standards of Title IX with regards to sex discrimination. The key change in the policy was

6

that students would not be involved in the adjudication of sexual assault cases involving students.

33.     Scot's Key constitutes a contract between Wooster and its students.  A copy of Scot's Key is attached hereto as Exhibit "A."

34.     Scot's Key is designed to be educational, not punitive.  It promises to recognize all "persons in their individuality and also affirms the social dimension of human existence."

35.     Scot's Key also promises to ensure "essential fairness" in the school's Judicial System.  This term is defined as follows: (a) the accused will be presented with the charges against him or her in writing; (b) the accused has the opportunity to a hearing where he/she may confront the accuser; (c) the accused has the opportunity to defend himself/herself against the charge(s) and to present witnesses to assist in that process; (d) witnesses must be individuals with direct knowledge of the incident or its impact, and (e) the accused is presumed innocent, and it is the responsibility of the accuser to prove guilt.

36.     The Scot's Key requires prompt reporting: any member of the Wooster community who wishes to pursue a complaint against another student must file a written charge with the Chairperson of the Judicial Board or a member of the Residence Hall staff member and/or the Dean of Students staff within thirty (30) days of an incident.

37.     Scot's Key does not contain an exception to enlarge the 30 day timeframe.

38.     Cases shall be decided upon a standard of "preponderance of the evidence."  This standard is the lowest burden of proof in civil matters.

39.     The Judicial System contains a three-level hierarchy for adjudication.  The more serious the charge(s), the higher the level of adjudication, which in turn, affords greater due process given that the sanctions can be more severe.

40. The third level of adjudication occurs with the Judicial Board, the Dean's Hearing Board, or the Dean of Students.

41. The Judicial Board consists of four voting student members, two voting faculty members, one voting member from the Administrative Staff appointed by the President. A Judicial Board quorum requires five members with at least one representative from each of the three constituencies.

42. The Dean's Hearing Board is comprised of four voting board members, including a Chair, who are assigned on a case-by-case basis by the Dean of Students.

43. Misconduct cases heard at level three are those matters involving alleged violations of the Code of Social Responsibility. Allegations of sexual assault and/or misconduct that fall within the ambit of Title IX are adjudicated at this level.

44. Scot's Key states that all judicial proceedings are confidential. Wooster is not permitted to release specific information about judicial hearings involving charges against students, except for the final result of any judicial hearing in which it is determined that the student or students involved committed a violation of a Wooster rule or policy with respect to a non-forcible sex offense (statutory rape or incest) or a crime of violence (arson, assault offenses, burglary, criminal homicide) destruction/damage/vandalism of property, kidnapping/abduction, robbery and forcible sex offenses.

45. The accused has the right to understand the exact nature of the charges lodged against him and the complaint should be reduced to writing by the accuser.

46. The accused has the right to view documents, including actual deposition statements if applicable.

47. The accused has the right to call witnesses.

48.　　The accused has the right to confront witnesses, especially the accuser.  While the hearing will proceed without the accused present, the accuser must be at the hearing to guarantee the right of confrontation.

49.　　If an accused has legal counsel, counsel may not be present at a judicial hearing.

50.　　Within two (2) business days of the hearing, an explanation of the hearing body's decision shall be included in a letter to the accused, and, in the case of a crime of violence or a non-forcible sexual offense, also to the accuser.  If a case does not involve a crime of violence or a non-forcible sexual offense, Scot's Key does not afford an accuser the right to information about the final disposition of the proceeding.

51.　　A copy of the decision letter shall appear in the student's personnel file.

52.　　A student found guilty by the Judicial Board or Dean's Hearing Board may appeal that decision in writing within five (5) business days following notification of the decision by the hearing body to the President of the College, whose decision will be final.

53.　　Scot's Key does not confer an appeal right on an accuser in cases that do not involve a crime of violence or a non-forcible sexual offense.

**C. John's History with Jane Doe 1**

54.　　John has known Jane Doe 1 since the end of his freshman year.  They met because they both lived in the same dormitory.  The two shared a very close, personal relationship.

55.　　Not long after meeting, John and Jane Doe 1 began engaging in consensual sexual activity.  Since 2013, they engaged in sexual intercourse well over one hundred times.

56.　　On September 16, 2016, Jane Doe 1 came to John's dorm room late in the evening.  They cuddled and then went to sleep.  When they woke up in the morning, they

9

participated in consensual sexual intercourse.  Later that day, John was shocked to discover that Jane Doe 1 blocked him from her social media without explanation.

57.     Two days later, on September 19, 2016, Chief Steven Glick ("Glick"), Director of Security and Protective Services, contacted John in connection with an allegation lodged by Jane Doe 1 that John committed sexual assault.  Glick confronted John without allowing John to see Jane Doe 1's complaint. John was devastated by these accusations and denied any wrongdoing.

58.     Notwithstanding John's resolute denial of misconduct, Glick served him with a No Contact Order.  A copy of the No Contact Order is attached as "Exhibit B."

59.     On September 20, 2016, Title IX Coordinator Angela Johnston ("Johnston") emailed John and instructed him to go to the President's Office on September 21, 2016, to meet with Johnston and Jessica Ettell ("Ettell"), Director of Student Rights and Responsibilities.

60.     The next day, John met with Johnston and Ettell.  During this meeting, John learned of the possibility that he may be required to move out of his dorm.

61.     A day later, on September 22, 2016, Johnston issued a letter to John and stated that Jane Doe 1 did not wish to proceed with a formal process that could result in charges in the Wooster Judicial System.  Wooster, however, did not retract the No Contact Order between John and Jane Doe 1.

62.     John was mystified by the situation as he was never informed of the basis for Jane Doe 1's claim against him.  Further, Jane Doe 1's claim was entirely inconsistent with her long-standing relationship with John.

63.     On September 22, 2016, John became so despondent that he sent the following two sentence email to Jane Doe 1:

> I can't sleep, I've tried to kill myself I can't go outside, they're
> telling me I have to move…I care about you deeply and I honestly
> have no idea why this is happening…Please

64.     That same night, Security and Protective Services visited John and asked him if he is a risk to himself.  John told security that he had visited the Wellness Center.

65.     After speaking with Security and Protective Services, John decided to go for a drive to clear his head.  Jane Doe 1 saw John drive away, and she called campus police to contact the Wooster City Police Department to search for John.  When John returned from his drive, he learned that the police were looking for him.

66.     Distraught and overwhelmed, John then visited the Wellness Center for a second time.  This time he had to undergo an additional evaluation to determine whether he was at risk for harming himself.

67.     The next day, at 10:00 a.m., John was informed that he was required to meet with Dean Buxton, Ettell and Kayla Campbell for a meeting at 10:30 a.m.  At this meeting, John learned that he would have to move out of Kenarden Residence Hall by 2:00 p.m. that day.  He was forced to move because Jane Doe 1 decided that she wanted remain in Kenarden Residence Hall because the other dorms did not have the style of room that she preferred.

68.     On September 28, 2016, John emailed Ettell to request a copy of Jane Doe 1's complaint against him so that he could understand the reason behind the demands and restrictions imposed upon him by Wooster.  Citing FERPA, Ettell denied John's request.  John responded to her denial as follows:

> I feel that if charges have been filed against me by a complainant,
> and I have been forced to move, modify my schedule I should be
> allowed to know exactly what I have been charged for. . . I have
> been treated as if I was guilty and I even asked for an investigation.

John received no response to this request.

11

69.     On October 10, 2016, Joe Kirk ("Kirk") from Security and Protective Services emailed John and stated that he needed to speak with John about other allegations by Jane Doe 1 that John placed vegetables near her car.  John met with Kirk and denied the allegations.

70.     In the weeks that followed, Jane Doe 1 persisted in her campaign against John.

71.     In November 2016, despite the fact that John was required to study in a designated library pursuant to the terms of the No Contact order, Jane Doe 1 visited the same library and encountered John.  She proceeded to stare at him.  She also complained to campus security that John stares at her in a hostile fashion; thereby creating the impression that John violated the No Contact order when Jane Doe 1 purposely went to John's designated library to harass him.

72.     On November 19, 2016, John emailed Johnston about the continual abuse by Jane Doe 1.

73.     Johnston and Ettell met with John on November 21, 2016 to discuss the library incident.  John requested that Jane Doe 1 not be permitted to enter the library in which John was designated to study.  No one ever responded to John's concerns or granted his request that he and Jane Doe 1 be assigned to separate libraries.

74.     Instead, on December 2, 2016, John received a charge letter stating that he may have violated Wooster's Code of Social Responsibility as outlined in Scot's Key.  A copy of the letter is attached hereto as "Exhibit C."  The charges included, *inter alia*, allegations of harassment, coercion, intimidation and assault.  John was told that a Judicial Hearing must be held to determine guilt or innocence.

75.     The charge letter did not specify what specific actions of John formed the basis for the charges.

76. The charge letter was signed by Jane Doe 2, Judicial Board Chair and co-president of K(no)w with Jane Doe 1.

77. In accordance with Scot's Key, John's case required a Judicial Hearing. For unexplained reasons, the Judicial Board was not available to hear John's case, and his hearing instead took place before a Dean's Hearing Board.

78. The Dean's Hearing Board convened a hearing on December 8, 2016 at 5:00 p.m., just days before John began his final examinations for the Fall 2016 term.

79. The hearing was tantamount to a Star Chamber.

80. During the hearing, John was not allowed to provide any background on his relationship with Jane Doe 1, and he was told that the hearing was not a Title IX matter.

81. Jane Doe 1 was not present at the hearing, thus, John was denied an opportunity to confront his accuser.

82. At the hearing, John was questioned about several allegations raised by Jane Doe 1. The allegations included John's September 22, 2016 email to Jane Doe 1, vegetables found near Jane Doe 1's car, and a SnapChat video posted by John.

83. The SnapChat video was nothing more than a video created by John that he disseminated to his social media friends. The video did not name Jane Doe 1 and was not directed at her as John knew that she had blocked him from her social media.

84. On December 12, 2016, John received a Letter of Sanctions signed by Lynette Mattson, Chair of the Dean's Hearing Board. A copy of this letter is attached hereto as Exhibit "D." The letter stated that John's September 22, 2016 email to Jane Doe 1 constituted a violation of the No Contact Order and served as the basis for sanctions.

85. The Dean's Hearing Board imposed upon John the following sanctions:

    a.   Recorded Disciplinary Probation noted in his student personnel file;

    b.   That the No Contact Order should remain in place until graduation;

    c.   That John had to commit to complete a guided reading with Dr. Charles Kammer on the themes of trauma, fear and emotional abuse;

    d.   That John must attend regular meetings with Dr. Kammer to discuss his personal choices on campus.

    e.   In addition, John was told that failure to comply with all of the conditions would result in further discipline.

86.    John received the Letter of Sanctions in the middle of final examinations.

87.    On December 28, 2016, John submitted a written appeal of the sanctions imposed on him.  A copy of the appeal is attached hereto as "Exhibit E."  In his appeal, John outlined multiple violations of his procedural rights, including a violation of the 30 day rule, a violation of his right to be presented with the basis for the charges, and a violation of his right to confront his accuser.  He also appealed the severity of the sanctions imposed.

88.    John learned that Jane Doe 1 also appealed the sanctions against John even though Scot's Key does not confer an appeal right on a complainant, nor was Jane Doe 1 entitled to information about the outcome of John's hearing.  Wooster never permitted John to view or respond to Jane Doe 1's appeal.

89.    On January 12, 2017, President Bolton emailed John to advise him that she denied the procedural objections to his appeal.  However, she conceded that Wooster violated the 30 day rule but that the error was not material.

90.    President Bolton also informed John that through Jane Doe 1's appeal unspecified new evidence had been brought to Wooster's attention.

91.     On January 23, 2017, President Bolton emailed Dean Buxton to request that the Dean's Hearing Board review a SnapChat video "including new information presented by Ron Roe."

92.     Upon information and belief, Ron Roe is Jane Doe 1's boyfriend.  He is a student at Wooster scheduled to graduate in May.

93.     The SnapChat video in question was not new evidence as it was discussed at the hearing on December 8, 2016.

94.     On January 27, 2017, Dean Buxton emailed John and advised him that President Bolton requested that she reconvene the members of the Dean's Hearing Board to review the new information presented by Jane Doe 1 in her appeal.  Dean Buxton told John that a meeting would take place on February 1, 2017, and that the meeting would be a review, not a hearing.

95.     On January 29, 2017, John received email correspondence from his former Hearing Counselor, a student, who stated he had discussed the new matter with Dean Buxton and that, according to Buxton, the February 1, 2017 meeting would not be a hearing.

96.     Despite Buxton's assurances that the February 1, 2017 meeting would not be a hearing, John received additional email correspondence from Dean Buxton on January 29, 2017 wherein she said "the purpose of the hearing on February 1, 2017 is to review new information pertaining to the SnapChat video."  She proceeded to describe the new information as an email from Ron Roe to President Bolton.

97.     Thereafter, on January 31, 2017, Dean Buxton emailed John to advise him that the policies and procedures from the prior hearing would apply.  Dean Buxton also attached to her email a document entitled "How to Prepare for Your Hearing."

98.     To prepare adequately for the meeting that transformed into a hearing, John requested the opportunity to review the entire case record.  Dean Buxton denied John's request.

99.     John also inquired of Dean Buxton whether Jane Doe 1 would be present at the hearing.  Dean Buxton responded that Jane Doe 1 would only be present if John submitted questions for Jane Doe 1 to answer, despite the fact that this is not provided for in Scot's Key.

100.    John did not submit questions for Jane Doe 1.  Thus, based on the representations of Dean Buxton, he reasonably believed that Jane Doe 1 would not be present.

101.    The second hearing took place at 6:30 p.m. on February 1, 2017 at Galpin Hall.

102.    Not only did Jane Doe 1 attend the hearing, John learned that she spoke to the Dean's Hearing Board outside of John's presence for over one hour.

103.    The Dean's Hearing Board also received a written statement from a witness.  John was never given the opportunity to review this statement prior to the hearing or examine the witness.

104.    After meeting with Jane Doe 1 behind closed doors, the Dean's Hearing Board questioned John.  During this questioning, the Dean's Hearing Board focused exclusively on the SnapChat video that was previously discussed at the hearing on December 8, 2016.  The panel never inquired about or discussed the e-mail sent by Ron Roe.

105.    The hearing on February 1, 2017 constituted nothing more than an audience for Jane Doe 1 to vent about John behind closed doors, without considering the stress and pressure placed on John by requiring him to submit to a second hearing.

106.    On February 3, 2017, John received a letter from Lynette Mattson, Chair of the Dean's Hearing Board, stating that the SnapChat video in question did not constitute a violation

of Code of Social Responsibility. Mattson further advised that the original findings and sanctions would remain in place.

107. Emboldened by Wooster, Jane Doe 1 has continued to defame and harass John and to encourage members of the Wooster community to exclude John from school activities.

108. For example, Jane Doe 1 instructed members of the fraternal organization at Wooster called Men of Harambee to bar John from their events because John is purportedly a public safety concern.

109. From September 2016 to February 2017 and continuing through today, Wooster created and perpetuated an environment in which John was denied principles of fairness and justice by being prosecuted in a disciplinary process under a presumption of guilt. The unfair and one-sided process deprived John of educational opportunities at Wooster on the basis of his sex.

110. Defendant's continuing actions, which were both negligent and intentional, have caused John serious emotional distress and substantial, immediate and continuing damages.

111. The existing No Contact Order and accompanying sanctions have damaged John's reputation and impacted his ability to enroll in graduate schools and to pursue certain careers.

112. The No Contact Order also caused John extreme humiliation and disruption to his life as he was forced to move out of his dorm even though Jane Doe 1 decided not to proceed with an investigation into her baseless claim of sexual assault. Wooster's biased procedures and unduly severe sanctions have marred John's academic record, alienated him from his peers, and allowed Jane Doe 1 and K(no)w's political agenda to further the belief that John is part of a rape culture.

113. Wooster's disciplinary proceedings involving John were fundamentally unfair, unreasonable, and intended to placate Jane Doe 1 and K(no)w. Wooster violated John's rights through the following actions:

a. Imposing a No Contact Order without allowing John to see the Complaint against him;

b. Allowing a No Contact Order to remain in effect after Jane Doe 1 declined to proceed with a formal investigation;

c. Forcing John to move out of his dorm simply because Jane Doe 1 did not want to move;

d. Issuing a charge letter even though the timeframe within which to file charges expired;

e. Proceeding to a hearing without providing John with written notification of his specific actions that provided a factual basis for the charges;

f. Denying John's request to extend the hearing date to occur after final examinations;

g. Allowing a hearing without the complainant present;

h. Denying John the right to confront his accuser;

i. Levying sanctions that were excessive in light of the infraction involved;

j. Notifying Jane Doe 1 of John's hearing outcome and sanctions;

k. Allowing Jane Doe 1 to file an appeal;

l. Denying John's appeal;

m. Convening a second hearing to examine evidence previously discussed at the first hearing;

n. Misleading John as to whether the matter was a meeting or a Title IX hearing;

o. Denying John's request to review the entire disciplinary file prior to the second hearing;

p. Leading John to believe that Jane Doe 1 would only be present at the second hearing if he submitted questions for her;

18

q. Allowing Jane Doe 1 to speak to the Dean's Hearing Board outside of John's presence; and

r. Changing its position as to whether John's disciplinary matter was a Title IX matter or a student misconduct matter.

## V.    COUNT I
### (Violation of Title IX)

114.    John incorporates by reference each of the paragraphs above as if fully set forth herein.

115.    Title IX provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

116.    Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

117.    Wooster receives federal funding in various forms, including, but not limited to, grants and federal student loans provided to Wooster by its students or given to Wooster by the federal government directly.

118.    Wooster's conduct, as described above, discriminated against John, on the basis of his sex, through discriminatory, gender-biased implementation of Wooster's policies and procedures in the wake of pressure from the U.S. Department of Education, prior complaints of females, and campaigning by K(no)w.

119.    Upon information and belief, a female has never been disciplined at Wooster for sexual misconduct.

120.    The sanctions imposed upon John are excessive in light of the underlying conduct in issue – a two sentence email from John to Jane Doe 1 on September 22, 2016.  Also, the

sanctions are unreasoned given the offense for which John was sanctioned did not involve sexual misconduct.

121.    Wooster has failed to remediate its discriminatory actions against Plaintiff.

122.    As a result of the college's acts and omissions as described above, Plaintiff has suffered multiple forms of damage.

## VI.    COUNT II
### (Breach of Contract)

123.    John incorporates by reference each of the paragraphs above as if fully set forth herein.

124.    At all times relevant hereto, a contractual relationship exists between Wooster and John through Scot's Key and John's payment of tuition.

125.    Wooster was required to act in accordance with Scot's Key in addressing complaints of sexual and other misconduct, conducting impartial and fair investigations of such complaints, adjudicating those complaints and deciding requests for appeals.

126.    For all the reasons set forth above, Wooster has materially breached its contract with John by failing to comply with policies and procedures governing misconduct proceedings set forth in Scot's Key.

127.    As a direct, proximate and foreseeable consequence of Wooster's numerous material breaches as described above, John has sustained significant damages including, but not limited to, being forced to move to another dormitory, having to endure improper sanctions, having an academic file that improperly includes recorded probation, and impairing John's grades by forcing him to proceed to the hearing during final examinations.

128.    The censure on John's record inhibits his ability to enroll in certain graduate schools or obtain employment.

20

129.    John has also sustained monetary damages, extreme emotional distress and loss of support and companionship from his college community.

130.    John is entitled to recover multiple forms of damages for Wooster's breach of its contractual obligations and duties, as set forth above.

## VII.    COUNT III
### (Promissory Estoppel)

131.    John incorporates by reference each of the paragraphs above as if fully set forth herein.

132.    As described above, Scot's Key and other acts of Wooster are intended to induce reliance on the part of John Doe.

133.    In reasonable reliance, John accepted the Wooster's offer of admission and scholarship based on the Wooster's representation that it would honor its express and implied promises, including the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

134.    John relied to his detriment on these express and implied promises and representations made by Wooster.

135.    As a direct, proximate and readily foreseeable consequence, John has sustained multiple forms of damages as set forth above.

## VIII.    COUNT VI
### (Injunctive Relief)

136.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

137.    Plaintiff is likely to prevail on his claims against Wooster.

138.    The entire process, as described above, was fundamentally flawed and violates Title IX as well as the other causes of actions, set forth above, against Wooster.  What ensued

was a litany of errors committed by Wooster against John.  Wooster should be ordered to remove any notation of sanctions from John's personnel file and to stop imposing the current sanctions on John.

**WHEREFORE**, Plaintiff seeks the following relief from the Court:

a)      An injunction requiring the removal of any sanctions from John's personnel file and prohibiting Wooster from reporting any disciplinary actions taken against Plaintiff with regard to the sanctions imposed herein to any third party or academic institution;

b)      Award attorneys' fees, expenses, and costs;

c)      Any further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

*/s/ Kristina W. Supler*
Susan C. Stone (0064445)
Kristina W. Supler (0080609)
McCARTHY, LEBIT, CRYSTAL
& LIFFMAN CO., L.P.A.
101 West Prospect Ave., Suite 1800
Cleveland, Ohio 44115-1088
(216) 696-1422
(216) 696-1210 (fax)
scs@mccarthylebit.com
kws@mccarthylebit.com

*Counsel for Plaintiff*

## VERIFICATION

I, █████████, being duly sworn, state that I have reviewed the factual allegations contained in this Verified Complaint.  I am the John Doe described in the Complaint.  I believe that the disclosure of my identify will cause me irreparable harm as this case involves matters of utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §1232g, 34 CFR Part 99.  All of the factual allegations in the Verified Complaint are true and accurate to the best of my knowledge.



Sworn to before me and subscribed in my presence this ⎣4⎤ day of February, 2017.

NOTARY PUBLIC

{00999503-1}