IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DOE | ) | CASE NO. 5:17-cv-00323 |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| -vs- | ) | |
| | ) | |
| THE COLLEGE OF WOOSTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**MOTION FOR PRELIMINARY INJUNCTION**
**(Oral Hearing Requested)**

NOW COMES the Plaintiff, John Doe, ("John") by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 65(a), and hereby moves this Honorable Court for a preliminary injunction against Defendant The College of Wooster ("Wooster"). This matter arises out of Wooster's mishandling of disciplinary proceedings involving John. John asserts that Wooster's investigation and judicial process were in violation of Title IX of the Education Amendments of 1972 ("Title IX") as set forth in 20 U.S.C. § 1681-1688 and that Wooster breached its written policies contained in The Scot's Key ("Scot's Key"). John seeks injunctive relief.

While Plaintiff has set forth multiple meritorious claims against Wooster in his Verified Complaint, this motion will focus on his Title IX and breach of contract claims, which can be considered based on facts known to both parties. In light of the time sensitive nature of this motion, Plaintiff requests an expedited briefing and hearing schedule.

## I. BACKGROUND

John began attending classes at Wooster in the fall of 2013. He is scheduled to graduate this May. Jane Doe 1 is a member of K(no)w, which is an active student organization whose stated purpose is fight against the highly publicized rape culture on college campuses. *See* https://www.woster.edu/students/organizations/special/know/. As outlined in the Verified Complaint, K(no)w has become a loud critic of Wooster's policies for the handling of complaints of sexual misconduct, and K(no)w has engaged in several attention-seeking activities on campus. (Compl. ¶ 4-10).

## II. STATEMENT OF FACTS

### A. The Events Leading to the Proceedings Against John

John met Jane Doe 1 near the end of his freshman year. (Compl. ¶ 54). John and Jane Doe 1 both lived in the same dorm. They shared an instant connection, and not long after meeting, began engaging in consensual sexual activity. John estimates that he and Jane Doe 1 had sexual intercourse over one hundred times from the end of their freshman year to September of 2016. (Compl. ¶ 55).

On September 16, 2016, Jane Doe 1 came to John's dorm room late at night to hang out and sleep over. After cuddling, they fell asleep. In the morning, they engaged in sexual intercourse. Hours later, John learned that Jane Doe 1 blocked him from her social media without any explanation. (Compl. ¶ 56). Two days after spending the night with Jane Doe 1,

John was contacted by Chief Steven Click ("Glick"), Director of Security and Protective Services, regarding an allegation of sexual assault lodged by Jane Doe 1. John adamantly denied any wrongdoing. Notwithstanding John's denial and without further investigation, Glick served him with a No Contact Order. (Compl. ¶ 58).

On September 20, 2016, Wooster Title IX Coordinator Angela Johnston ("Johnston") emailed John and directed him to attend a meeting at the President's office the following day. John met with Johnston and Jessica Ettell ("Ettell"), Director of Student Rights and Responsibilities, about Jane Doe 1's claim against him. A day later, Johnston sent John a letter informing him that Jane Doe 1 did not wish to move forward with a formal Title IX investigation. Nonetheless, the No Contact order remained in place. (Compl. ¶ 61).

John struggled to understand the basis for Jane Doe 1's false claim, which was entirely inconsistent with their long-standing friendship. Seeking clarity, on September 22, 2016, John sent an email to Jane Doe 1. (Compl. ¶ 61).

A day later, John learned that he was required to move out of his dorm. (Compl. ¶ 67). Administrators at Wooster informed John that he must move because Jane Doe 1 wanted to stay in her dorm. John was also required to make changes to his class schedule. Although Wooster required John to move, restricted his access to locations on campus, and limited the hours in which John could visit certain places on campus, Wooster never provided John with any detailed information about Jane Doe 1's claim against him.

In the coming weeks, Wooster continued to oblige Jane Doe 1. For instance, in October, John was caused to respond to Jane Doe's allegation that he left vegetables near her car. (Compl. ¶ 69). Then, in November, John was studying in the campus library to which he was designated by Wooster, and Jane Doe 1 visited the library and stared at him. She then

complained to Johnston and Ettell. (Compl. ¶ 71). John met with Johnston and Ettell regarding this incident, and he voiced his concern about on-going harassment by Jane Doe 1. He also asked that Jane Doe 1 be prohibited from visiting the library where he studies. Wooster ignored John's request.

### B. Wooster's Denial of John's Rights Throughout the Disciplinary Process

On December 2, 2016, without any prior notice, John received a charge letter signed by K(no)w co-president Jane Doe 2, who was also Chair of the Judicial Board. (Compl. ¶ 74). The letter stated that John may have violated Wooster's Code of Social Responsibility as outlined in Scot's Key, a copy of which is attached to John's Verified Complaint as Exhibit A. The letter provided no factual basis in support of the charges other than to say that the letter was issued as a result of "incidents which occurred between Monday, September 19, 2016 and Wednesday, November 16, 2016." (Compl. ¶ 75).

John's hearing took place on December 8, 2016 at 5:00 p.m., only days before final examinations. (Compl. ¶ 78). He attended the hearing uncertain about what he was defending himself against. Throughout the hearing, Wooster violated several of John's rights provided by Scot's Key. For example, John could not provide history about his relationship with Jane Doe 1. (Compl. ¶ 80). Furthermore, although the Dean's Hearing Board questioned John about Jane Doe 1's allegations of misconduct, John was denied the opportunity to confront his accuser because she did not attend the hearing. (Compl. ¶ 80).

On December 12, 2016, John received a Letter of Sanctions informing him that his email to Jane Doe 1 violated the No Contact Order and constituted the basis for sanctions. (Compl. ¶ 84). John received the following sanctions: Recorded Disciplinary Probation noted in his student personnel file; continued existence of the No Contact Order until graduation; guided reading

with Dr. Charles Kammer on the themes of trauma, fear and emotional abuse; regular meetings with Dr. Kammer to discuss John's personal choices on campus; and warning that failure to comply with all of the conditions would result in further discipline. (Compl. ¶ 85).

John appealed the disposition. (Compl. ¶ 87). In his appeal, John outlined multiple procedural violations. He also appealed the severity of the sanctions imposed. Jane Doe 1 also appealed the sanctions against John. Scot's Key did not confer an appeal right on Jane Doe 1, nor did she have a right to information regarding the disposition of John's hearing.

On January 12, 2017, President Bolton emailed John to advise him that she denied the procedural arguments in his appeal. (Compl. ¶ 89). With respect to John's argument regarding the severity of the sanctions imposed, President Bolton withheld her ruling on this argument until resolution of matters involving the "new evidence."

Approximately two weeks later, President Bolton emailed Dean Carolyn Buxton ("Dean Buxton") to request that the Dean's Hearing Board review a SnapChat video and new information presented by Ron Roe. (Compl. ¶ 91). Importantly, Ron Roe is, upon information and belief, Jane Doe 1's boyfriend and a student at Wooster. (Compl. ¶ 92). Lost on President Bolton was the fact that the SnapChat video in question was not new evidence. She arbitrarily and capriciously demanded that the Dean's Hearing Board reconvene to examine the supposedly new information. Dean Buxton communicated with John about the reopening of the matter and provided him with contradictory information.

John attempted to prepare for this second hearing, and he inquired whether Jane Doe 1 would be present at the hearing. Dean Buxton responded that Jane Doe 1 would only be present if John submitted questions for Jane Doe 1 to answer. (Compl. ¶ 99). Relying on this response, John chose not to submit questions for Jane Doe 1. Again, however, Wooster misled John. Not

only did Jane Doe 1 attend the hearing, she spoke to the Dean's Hearing Board outside of John's presence for over one hour. Additionally, the Dean's Hearing Board received a written statement from a witness. (Compl. ¶ 103). John was never given the opportunity to review this statement prior to the hearing. When the Dean's Hearing Board questioned John, the panel focused exclusively on the SnapChat video that was previously discussed at the hearing on December 8, 2016. (Compl. ¶ 104). There was no discussion of Ron Roe.

On February 3, 2017, the Chair of the Dean's Hearing Board sent John a letter stating that the SnapChat video in question did not constitute a violation of Code of Social Responsibility. (Compl. ¶ 106). Nonetheless, the letter advised that the original findings and sanctions imposed would remain in place.

Without question, Wooster's disciplinary proceedings against John were fundamentally unfair, unreasonable, and designed to placate Jane Doe 1 and her cohort at K(no)w. Wooster's wrongful actions have harmed John and deprived him of access to educational opportunities at Wooster. As a result of the injuries that John sustained at the hands of Wooster, John now seeks declaratory and injunctive relief, in addition to monetary damages.

### III.   LAW & ARGUMENT

Rule 65 of the Federal Rules of Civil Procedure provides for the issuance of a preliminary injunction. As explained by the United States Supreme Court, "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be had." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). In light of the limited purpose of this relief, "a preliminary injunction is often granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing." *Id.*

6

When adjudicating a motion for a preliminary injunction, a trial court considers the following factors:

1. Whether the movant has a strong likelihood of success on the merits;
2. Whether the movant would suffer irreparable injury without the injunction;
3. Whether the issuance of the injunction would cause substantial harm to others; and
4. Whether the public interest would be served by issuing the injunction.

*Certified Restoration Dry Cleaning Network v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007). These four considerations are to be balanced; they are not prerequisites that must be met by the moving party. *Id.* As established by the Verified Complaint, and the law and evidence contained herein, it is clear that John will suffer irreparable injury unless a preliminary injunction is issued.

**A.  John is likely to succeed on the merits of his claims.**

**1.  John's Title IX claim establishes Wooster's gender bias against males.**

Title IX is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. 20 U.S.C. § 1681. It provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).  In the recent case of *Doe v. Brown University*, 2016 U.S. Dist. LEXIS 21021, (D.R.I. Feb. 22, 2016), the United States District Court of Rhode Island noted that the pressure on colleges and universities from the United States Department of Education's Office for Civil Rights has caused backlash against male students.

Recently, in *Doe v. Cummins,* 2016 U.S. App. LEXIS 21790, *35 (6th Cir. Dec. 2016), the Sixth Circuit—looking to the Second Circuit's decision in *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994)—outlined a framework for evaluating students' Title IX discrimination

claims. The court in *Cummins* expressly outlined two categories of Title IX gender bias claims related to student disciplinary matters: erroneous outcome and selective enforcement.[1]

### a. Erroneous Outcome

According to the *Cummins* Court, "a successful erroneous outcome claim requires the plaintiff to show that the outcome of the University's disciplinary proceeding was erroneous because of sex bias." Stated another way, an erroneous outcome claim may be based on (1.) the discipline of a student who did <u>not</u> engage in sexual misconduct or (2.) a student who may have engaged in misconduct, but who was disproportionally disciplined due to his male gender. *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448 (2nd Cir. 1994); *citing Yusuf, supra.*

Here, John did not engage in sexual misconduct, and Jane Doe 1 chose not to proceed with a formal investigation of her allegation. Yet, Wooster treated John as if he had committed sexual misconduct. Wooster required John to abide, indefinitely, by the terms of a No Contact Order that forced him to move from his dorm after Jane Doe 1 was given the choice to stay, that limited where he was permitted to study on campus, and that required him to change his schedule. Finally, Wooster caused John to promptly respond to Jane Doe 1's ongoing specious claims against him for misconduct, while ignoring his reports of harassment by Jane Doe 1. Furthermore, Wooster censured John with recorded disciplinary probation and required John to participate in guided reading and regular meetings with Professor Kammer to discuss themes of trauma, fear and emotional abuse. These sanctions are designed for an individual who committed sexual misconduct, not someone who violated the Code of Social Responsibility.

---

[1] It should be noted that a district court in the Sixth Circuit recently contemplated and declined to conclude whether a plaintiff can assert a Title IX claim based on a theory of deliberate indifference. *See, e.g. Marshall v. Ohio Univ.*, 2015 U.S. Dist. LEXIS 155291, *27 (S.D. Ohio Nov. 2015)(declining to broaden the current framework of analysis (i.e. erroneous outcome and selective enforcement) in the absence of controlling Sixth Circuit precedent).

8

### b. Selective Enforcement

Claims of selective enforcement require a plaintiff to show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender. *Cummins,* 2016 U.S. App. LEXIS at *35. In essence, claims of selective enforcement allege that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf,* 35 F.3d at 715. These claims, sometimes called Title IX hostile environment claims, involve instances wherein male students feel that they have been subject to stricter scrutiny than female students.

In the present matter, there are multiple instances of similarly-situated females being treated more favorably than John in the school's Judicial System due to their gender. Examples of selective enforcement include the following events:

<u>Application of the 30-day rule</u>

To ensure prompt reporting of misconduct, Scot's Key requires any member of the Wooster community who wishes to pursue a complaint against another student to file a written charge within thirty (30) days of an incident. (Compl. ¶ 37). Scot's Key does not provide for any enlargement of the 30 day timeframe. When members of K(no)w disseminated posters that included personally identifiable details about male student accused of sexual misconduct, the students, upon information and belief, avoided disciplinary sanctions and Wooster permitted K(no)w to remain an active student organization on campus. John has reason to believe that female students proceeded through Wooster's disciplinary process and successfully appealed Wooster's violation of the Scot's Key provision requiring that charges be filed within 30 days of an incident. However, when John appealed his disciplinary case, he cited Wooster's violation of the 30-day rule. President Bolton acknowledged that Wooster violated the rule, but claimed that

9

the violation did not undermine the fairness of the proceeding. In essence, members of K(no)w and John raised the same procedural argument; yet, Wooster denied John's appeal.

Requests for No Contact Orders

Even though Jane Doe 1 declined to proceed with a formal investigation into her baseless allegation of sexual misconduct by John, Wooster issued a No Contact Order. Wooster also required John to move from his dorm simply because Jane Doe 1 did not want to move. Finally, Wooster forced John to make changes to his schedule and limited his overall freedom to move through campus.

Yet, in November of 2016, John met with Johnston and Ettell and requested that he and Jane Doe 1 each be designated to separate study spaces on campus. John explained that Jane Doe 1 harassed him by entering a library, where she knew he would be present, and staring at him. Despite John's concern and request for separate study space, Wooster failed to respond and John was caused to continue to fear an encounter with Jane Doe 1 in the library.

From Jane Doe 1's first contact with Wooster to the present time, Wooster has consistently capitulated to her demands without regard for John or his rights as a student. Not only has John been mistreated by Wooster, he has been treated differently than similarly-situated females. Wooster exhibited clear gender bias against John in order to avoid public scrutiny and criticism that the school is not responsive to claims of sexual misconduct. The foregoing discussion demonstrates that John is likely to succeed on the merits of his Title IX claim.

### 2. John's breach of contract claim demonstrates Wooster's multiple violations of Scot's Key.

To prove a breach of contract under Ohio law, the following elements must be established: 1) the existence of a valid contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damage or loss to the plaintiff. *Resource Title Agency, Inc. v. Morreale Real*

*Estate Services, Inc.*, 314 F. Supp. 2d 763, 769 (N.D. Ohio 2004); *see also Ohio Environmental Developmental Ltd. Partnership v. Envirotest Systems Corp.*, 478 F. Supp. 2d 963, 970 (N.D. Ohio 2007).

It is well-settled that the relationship between a student and a university is contractual in nature. *Al-Dabagh v. Case Western Reserve Univ.*, 23 F. Supp. 3d 865 (N.D. Ohio 2014); *citing Bleicher v. Univ. of Cincinnati College of Med.*, 78 Ohio App. 3d 302, 308, 604 N.E.2d 783 (1992) (stating "It is axiomatic that '* * * when a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature.' The terms of the contract between the university and the student are generally found in the college catalog and handbooks supplied to students."); *Cornett v. Miami Univ.*, 728 N.E.2d 471, 473 (Ohio Ct. Cl. 2000) (explaining "It is well recognized that when a student enrolls in a college or university, pays his or her tuition and fees, and attends the school, the resulting relationship is construed as contractual in nature."); *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998) (noting that a college-student relationship is essentially contractual in nature). The standard for interpreting a contract between a school and a student is that of "reasonable expectation," which is to say "what meaning the party making the manifestation, the university, should reasonably expect the other part to give it." *Doe v. Brandeis Univ.*, 2016 WL 1274533, *25 (D. Mass 2016*)*.

In the case at bar, John applied to Wooster for admission, and Wooster extended him an offer of admission for the academic year starting in September of 2012. John accepted Wooster's offer of admission and began attending classes in September of 2013, at which point in time, John began paying tuition. Wooster accepted John's tuition. (Compl. ¶ 26).

11

As a student at Wooster, John is bound by the Wooster student handbook Scot's Key. Scot's Key contains the Code of Social Responsibility and provides information regarding Wooster's policies and procedures for addressing misconduct cases within the school's Judicial System. Scot's Key promises to ensure "essential fairness" in the school's Judicial System. Sadly, however, Wooster repeatedly violated Scot's Key and deprived John of essential fairness. Examples of Wooster's failure to comply with Scot's Key include the following events:

Violation of the 30 day rule

As was previously discussed, Scot's Key requires any member of the Wooster community who wishes to pursue a complaint against another student to file a written charge within thirty (30) days of an incident. (Compl. ¶ 37). Wooster failed to follow this rule by disciplining John for his September 22, 2016 email outside of the permissible period for the filing of charges.

Failure to present John with the factual basis for the charges against him

The preamble contained in Section XV of Scot's Key addressing the Judicial System specifically confers upon an accused student the right to be presented with the charges against him in writing. At no time prior to his December 8, 2016 hearing did John ever receive any written explanation of the specific actions that constituted the basis for the charges against him. The charge letter issued to John on December 2, 2016 consisted solely of Scot's Key excerpts describing broad principles of conduct. When John attended his first hearing, he did not understand what conduct of his was in issue, nor did he understand whether the proceeding fell within the ambit of Title IX. At his hearing, John was told that the proceeding was not a Title IX matter. However, the panel then proceeded to question John in an ad hoc manner about the various allegations that Jane Doe 1 lodged against him.

Denial of the right to confront his accuser

The preamble contained in Section XV of Scot's Key addressing the Judicial System specifically confers upon an accused student the right to confront his accuser. Here, Jane Doe 1 was invited to the December 8, 2016 hearing, but declined to attend. At the second hearing, she spoke behind closed doors. Thus, John was denied his right to confront his accuser.

Application of the appeals process

Section IV(E) of Scot's Key states that a student found guilty by a Dean's Hearing Board may appeal that decision in writing. Nothing in the appeal procedures confers upon a complaining party the right to appeal. Yet, Wooster provided Jane Doe 1 with information regarding the outcome of John's hearing and permitted her to submit an appeal purportedly containing new evidence regardless of the fact that the evidence submitted was previously discussed on December 8, 2016. Only after John raised concerns related to the propriety of Jane Doe 1's appeal did Wooster claim that the matter was governed by Title IX procedures that are not specified in Scot's Key. Wooster made this representation despite previously telling John in his first hearing that his case was not regarded as a Title IX matter.

Unnecessarily convening a second hearing

The February 1, 2017 hearing constituted little more than a sham proceeding designed to appease Jane Doe 1 and K(no)w. Wooster consistently contradicted itself with respect to nearly all aspects of this hearing. Dean Buxton initially told John that President Bolton requested that a meeting be convened to discuss new evidence. However, Dean Buxton subsequently communicated with John about the policies and procedures for a hearing, not a meeting. Dean Buxton also misled John about whether Jane Doe 1 would be present. John did not submit questions for Jane Doe 1, and thus, did not believe she would be present. However, Jane Doe 1

13

attended the hearing and spoke to the Dean's Hearing Board outside of John's presence for over one hour. Additionally, the Dean's Hearing Board received a written statement from a witness, and John was never given the opportunity to review this statement prior to the hearing. Ultimately, the panel focused exclusively on the SnapChat video that was discussed at the first hearing and never inquired about Ron Roe or his email to President Bolton. Time and again through the disciplinary process, Wooster violated the terms and conditions contained within Scot's Key to the detriment of John.

### B. John will suffer irreparable harm to his reputation, education, and professional aspirations absent injunctive relief.

At the preliminary injunction stage, "irreparable harm consists of harm that could not be sufficiently compensated by money damages or avoided by a later decision on the merits." *Canon, Inc. v. GCC Int'l, Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008). *Malibu Boats, LLC v. Nautique Boat Co.*, 997 F. Supp. 2d 866 *, 2014 U.S. Dist. LEXIS 15809, 2014 WL 417886 (E.D. Tenn. 2014). John is scheduled to graduate from Wooster in May of this year. He intends to apply to graduate schools to continue his education. As matters presently stand, his recorded disciplinary probation for sending a two sentence email endangers his academic record, his reputation, and his ability to pursue his educational and professional aspirations. Even though John's discipline will not appear on his transcript, when John applies to graduate schools and/or for jobs, he will have to respond honestly when asked whether he was ever disciplined at Wooster. Threatened reputational damage and loss of opportunities is "precisely the type of irreparable injury for which an injunction is appropriate." *The Fund for Community Progress v. United Way of Southeastern New England*, 695 A.2d 517, 521 (RI 1997).

### C. The balance of the equities favors John.

The balancing of the equities weighs decidedly in favor of John. Jon's academic and professional reputation has been blemished by Wooster. If John's censure is not removed from his file, his future opportunities will be significantly limited. Conversely, granting an injunction places no hardship on Wooster whatsoever.

**D.     The public interest is served by the issuance of an injunction.**

The public interest weighs heavily in favor of an injunction. Across the country, colleges and universities struggle with implementing the much criticized 2011 Dear Colleague Letter published by the Office for Civil Rights. In a recent article in the Yale Law Journal Forum, retired federal judge Nancy Gertner captured this sentiment. She observed that "there is . . . 'a real contest about where the line between sex and sexual violence or harassment is, and as with all lines, there will be uncertainty over where some marginal cases fall.' An administrative framework . . . policing these lines with few procedural protections, and less than transparently, raises . . . questions about fairness." *Complicated Process,* 125 Yale L.J. Forum 442, 448-449 (2016), *quoting* Jacob Gersen & Jeannie Suk, The Sex Bureaucracy, 104 CALIF. L. REV.(Aug. 2016) (manuscript at 1), http://web.law.columbia.edu/sites/default/files/microsites/law-theory-workshop/files/the_sex_bureaucracy_21.pdf. Without question, the public has an interest in the fairness, reliability, and transparency in academic disciplinary proceedings. In this case, granting an injunction will avoid the injustice of an unlawful and unduly harsh punishment imposed upon John following biased and improper disciplinary proceedings.

## CONCLUSION

For the reasons set forth above, this Court should grant John's requested injunctive relief as set forth in his Verified Complaint.

Respectfully submitted,

*/s/Kristina W. Supler*
Susan C. Stone (0064445)
Kristina W. Supler (0080609)
McCARTHY, LEBIT, CRYSTAL
& LIFFMAN CO., L.P.A.
101 West Prospect Ave., Suite 1800
Cleveland, Ohio 44115-1088
(216) 696-1422
(216) 696-1210 (fax)
kws@mccarthylebit.com
scs@mccarthylebit.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Motion for Preliminary Injunction has been served upon the following; *via electronic mail and/or regular U.S. Mail, postage prepaid;* this 16th day of February, 2017:

Peggy J. Schmitz, Esq.
Critchfield, Critchfield & Johnston, Ltd.
225 N. Market Street
Wooster, OH 44691
*schmitz@ccj.com*

Attorney for Defendant

                                           */s/ Kristina W. Supler*
                                           Susan C. Stone (0064445)
                                           Kristina W. Supler (0087272)